GEORGE T. MARYE, Appellant, *v.* J. P. MARTIN, Respondent.

Attorney as Agent in Negotiation not in Court. Where a clerk converted mining stock of his employer and deposited the larger part of the proceeds in a bank, and afterwards, having confessed, was called to an interview with the employer and his lawyer in the private rooms of the employer; where, upon disclosing the deposit, he was sent by the lawyer for the certificate of deposit, which he brought, endorsed over and delivered to the lawyer; and also delivered over certain other moneys of his own to the lawyer, who received them without stating in what character he accepted the same; and the employer said nothing: *Held*, that the clerk was justified in regarding the transaction with the lawyer as done with his employer.

Waiver of Tort by Accepting Money Paid Under Supposition of Waiver. Where a clerk had unlawfully converted the property of his employer and received the proceeds, and afterwards, upon being called to account by his employer, gave up all of the proceeds which he still had and other property of his own, which was accepted by the employer; and there was nothing said or done to disabuse the clerk of his supposition that the property was accepted in settlement: *Held*, that the effect of such acceptance was a waiver on the part of the employer of the tort of the clerk.

APPEAL from the District Court of the First Judicial District, Storey County.

Marye *v.* Martin.

This was an action to recover fourteen thousand dollars for alleged unlawful conversion of twenty shares of mining stock. The cause was tried by the court below without a jury, and judgment rendered for defendant. A motion for new trial having been denied, the plaintiff appealed from the judgment.

It appears from the findings that about November, 1871, plaintiff being the owner of twenty shares of the capital stock of the Savage Mining Company, one G. W. Lee, his clerk, wrongfully took it to the defendant, cashier of the Bank of California at Virginia City, and requested him to have it sold by Driscoll & Co., stock brokers; that defendant received the stock from Lee, without knowledge of the wrongful taking or of its ownership by plaintiff, and, without any intent to convert it to his own use, sent it across the street to Driscoll & Co., requesting them to sell it; that Driscoll & Co. sold it the same day in the regular course of business; that defendant the next day received nine hundred dollars, the proceeds of the sale, from Driscoll & Co., and paid the same over to Lee; that defendant received no remuneration for his services, but acted as he did as an accommodation to Lee; that Lee deposited six hundred dollars of the proceeds of the sale in the Bank of California at Virginia City, and kept three hundred dollars in coin; that in March, 1872, Lee informed plaintiff of the fact of his having taken and sold the stock, and that plaintiff thereupon consulted General Thomas H. Williams, attorney at law, touching the subject matter.

The findings proceeded as follows: " On the 15th of March plaintiff, Lee, and said Williams, had an interview at the private rooms of plaintiff, at the request of plaintiff, when Lee, among other things, disclosed the names of the persons through whom the stock had been sold. Plaintiff repaired to the bank and notified defendant that by the advice of his counsel, Williams, he intended to hold him responsible for

the sale of this stock. During this absence of plaintiff from the room, Lee went after this certificate of deposit for $600, which he had, the part proceeds of the sale of the stock. Plaintiff returning, inquired of General Williams where he had gone, and was informed in reply that he had gone for some money. Presently Lee came in and handed Williams an envelope containing this certificate of deposit. Plaintiff was asked for pen and ink, which was procured. Williams then requested plaintiff to leave the room, which he did. Lee then indorsed said certificate of deposit and delivered it to Williams. Shortly after this and the same day, Lee gave Williams, payable to his own order, a check for $217 22. Williams took this $817 22, and made a special deposit of it in the agency of the Bank of California in his own name, plaintiff being present at the time in the bank. Williams then told plaintiff the amount of money which he had recovered from Lee, but told plaintiff that he (plaintiff) had nothing to do with it, that it was his (Williams') own transaction. Williams also stated that it was his intention to pay over the money to the party who would be the sufferer by the said wrongful act of Lee. The $817 22 is still upon special deposit in the name of Williams."

The court below further found that General Williams was acting at the interview and proceedings above mentioned as the attorney and adviser of plaintiff; that Lee paid the money to Williams for the benefit of plaintiff; that on March 15, 1872, Savage stock sold in the market for $230 per share, and advanced from that time until April 22, 1872, when it sold for $725 per share, the highest price; and that plaintiff replaced the twenty shares taken from him by Lee at $340 per share.

*Williams & Bixler*, for Appellant.

I.  There is no finding that Williams was the agent of appellant in the matter of receiving money from Lee, nor

that he assumed to act as such agent, or represented himself by act or word as such, or that appellant so held him out, nor that Lee dealt with Williams as an agent, or believed him such, or had any reason to believe him such.    The only findings pertaining to the relations between appellant and Williams are to the effect that Williams was, in an interview and proceedings among the parties, acting as the attorney at law, counsellor, and adviser of the appellant.    What " proceedings " are meant may be a matter of doubt; but assuming that the meaning is that Williams, as the attorney at law of Marye, received the money given him by Lee, that would still fail as a defense; for the reason that the act would not have been within the scope of the attorney's authority and therefore not binding on Marye.    5 Dana, 11; 34 Penn. State, 318; *Noland* v. *Jackson*, 16 Ill. 272; *Wilson* v. *Wadleigh*, 36 Maine, 496; 15 Ver. 314; 3 Watts & Serg. 420; 1 Smede & Mar. 248; 2 id. 81; *Jewett* v. *Wadleigh*, 32 Maine, 110; *Garvin* v. *Lowery*, 7 Smede & Mar. 24.

II.    If the word proceedings, used in the finding, comprehends the receipt of the money, then it also embraces the disposition of it.    It therefore follows that Williams was authorized by Marye to obtain $817 from Lee, and deposited the same with the Bank of California for the benefit of the loser by Lee's wrongful act, and not for the benefit of Marye; which is very far from a settlement and condonation of the wrong.    To constitute the agreement necessary to establish the alleged ratification, it should first appear that Lee paid the money to Williams with the intent and belief that it was in settlement of the wrong, and next that Williams received it with the same intention, or that the circumstances were such that the law will infer that intention and estop him from claiming otherwise.

III.    Even if appellant had done personally all that Williams did, there would yet be wanting sufficient to sustain

the claim of settlement, for the reason that there was no agreement of settlement; that there was no intention on the part of Marye to make a settlement, or anything to justify Lee in the conclusion that he intended a settlement; and that the acceptance of the whole or of part of the proceeds of the wrongful sale could only be considered in mitigation of damages.    17 Pick. 1; 11 Missouri, 219; *Burn* v. *Morris*, 4 Tyrwhittle, 485.

IV.    It is very clear and conclusive, from the testimony, that appellant had no desire, purpose, or intention of making the alleged settlement with Lee, and did not in person do so, or commit any act which can be tortured into proof of such a settlement.    On the contrary, everything which he did was to the reverse of the proposition.    It seems to us that a court will not allow an unauthorized, unsolicited agency to be thrust upon a man, and hold him responsible for the consequences resulting therefrom, except upon the strongest proof that he has done something which caused injury to another, and under such circumstances as to make it unjust to allow him to repudiate the consequences legitimately resulting from his own conduct.

V.    How could Lee have been misled to his injury by appearances leading him to an erroneous conclusion concerning Williams' authority?    He lost nothing by the operation, because he only surrendered the custody of money not his, but rightfully belonging to another, and that money was deposited in a safe place, to be held for the rightful owner. Lee will receive no legal injury if Martin finally gets the $817, which Lee unjustly obtained from him, and certainly Martin will have no cause of complaint.    It is claimed that appellant waived Lee's wrongful act by reason of the alleged receipt of the fruits of the wrong.    But a waiver is an intentional relinquishment of a known right.    *Shaw* v. *Spencer*, 100 Mass. 395.    Here it is clear that there has been no such waiver or attempt at waiver.

*Mesick & Wood*, for Respondent.

I.   As to the agency of Williams there can be no doubt under the findings. If he was not agent for the plaintiff in those transactions with Lee, what was he? He was acting with the plaintiff, for him and at his request, and in his room, and about his business, and for no other known person, and got from Lee $600 of the proceeds of the conversion and $217 22 of other money; and the matter of the taking of the stock and the disposition of it and the making of amends by Lee to plaintiff seems to have been the entire business between the parties. In view of these facts how could any court find otherwise than that Williams was acting as the agent of the plaintiff? Such facts and circumstances must necessarily outweigh the simple declaration of Williams to plaintiff, unchallenged as it was and made after they had got the money from Lee, that "you, Mr. Marye, have nothing to do with it; this is my own transaction." Instead of that remark disproving the agency, it confirms it under the circumstances, and shows a manifest design thereby to make testimony against the agency and legal consequences legitimately flowing from their previous acts.

II.   The court has found distinctly that in all these transactions Williams *acted*, not pretended to act, as the attorney of the plaintiff. The word attorney when used without qualification and not in connection with any proceedings in court means the same as agent or attorney in fact. The authorities cited by appellant relate to attorneys at law in the management of legal proceedings and have no pertinency to the question in hand.

III.   The agency of Williams being established, the payment by Lee of the $217 22, not appearing to be a part of the proceeds of the sale of the stock, in connection with the $600, amounted in law to a waiver of the plaintiff's right of action against the defendant and others, mere instru-

ments in the sale of the stock. We do not contend that such is the effect of a return by the wrong doer to the owner of a part of the property taken or of the proceeds of its sale; for that only amounts to restoring the property to its owner and can therefore only go in mitigation of damages. There is no contract between the parties involved in the proceeding. The owner only takes back what belongs to him, and of course ought not to recover for what is restored. But when the owner enters into a contract with him, who has deprived him of his property, for a settlement of the wrong and actually receives payment of the whole or a part—accepts an agreement to pay the whole or a part— the case stands upon entirely different grounds. The parties have then taken the matter out of the hands of the law as a mere tort, and have made it the subject of contract between themselves. And when it becomes the subject of contract between the parties it ought not to remain, and according to the authorities will not remain, a tort actionable in the courts against mere instruments in effecting the sale of property taken but not participating in its taking. 11 Wis. 180; 18 La. An. 147; 2 Mass. 105. Story on Agency, Sec. 254.

IV. To whom under this evidence would the courts award the money on deposit in the name of Williams? It cannot be the property of Williams, unless it was made a gift to him by Lee or the plaintiff; and that is not claimed on the part of any one. The defendant has no right to it, for Lee parted with it upon the understanding that it was to go to him under any contingency; and at the time of its receipt by Williams, according to the evidence, Williams was not in the interest of the defendant; and defendant was not relying on Williams for any favor or protection whatever, and there was no privity between them. Lee could not recover it back upon any other ground than of his having been defrauded out of it by false pretenses. The result is that

upon any fair theory, no one but appellant could legally claim the money from Williams.


By the Court, WHITMAN, C. J.:


One Lee, clerk for appellant, converted twenty shares of mining stock, appellant's property; by the kindness of respondent sold the same through his brokers at less than usual commissions; received nine hundred dollars or thereabouts, of which he deposited six hundred. Afterwards he confessed his dereliction, but refused to name the party through whom he sold. Shortly after, appellant with General Williams, an attorney at law, had an interview with Lee in the private rooms of appellant, when and where Lee divulged the name of respondent as the party through whose offices he had disposed of the stock, disclosed the amount obtained therefor, and delivered to General Williams the certificate of deposit for six hundred dollars, portion of the proceeds of the sale; also the check of Driscoll & Co. for $217 22, amount due from them to Lee for wages, he having been for some time previous in their employ.

This money was taken by General Williams, and by him specially deposited in bank, with the announced intention of delivery to the loser in the transaction. Lee, however, was never informed of this intention. His remembrance is, that he indorsed the certificate of deposit before appellant and delivered it to him : this is denied by appelant and General Williams, who testify that appellant left his room by request of General Williams, immediately after furnishing pen and ink, being told that the transaction about to be had was General Williams' own. However that may be, Lee surrendered that certificate and gave up his own money, as he supposed to appellant, on account of the converted stock.

Was he justified in such supposition by the acts of the parties? And first as to the capacity in which General Williams acted. Lee calls him counsel for appellant, his lawyer. Appellant says that he invited General Williams to be present as a friend; that nothing was said about his acting as attorney, but if. he so considered himself that it is all right. General Williams disclaims any intention to act for appellant, but says he got the money from Lee and holds the same for the benefit of the losing party.

Lee, however, as has been said, knew nothing of this intention; he saw appellant and General Williams acting apparently as one; and he gave the money to one as to the other; he was kept in the dark as to the use to be made of the money and certainly acted according to his lights, when he supposed that he was paying out his own money, in addition to giving up the remnant of the proceeds of the sale of the stock, in settlement to that extent of his wrong. If he was sane, he could have had no other idea. He was called to an interview with appellant and General Williams in the private rooms of appellant; he was then and there asked by appellant what he had done with the money received for the stock; he confesses; General Williams then sends him for the certificate of deposit, which is indorsed and delivered in the presence of and to appellant—according to Lee's remembrance; not so according to General Williams, who is positive while appellant is uncertain upon the point; but General Williams is undoubtedly correct, as he had a plan which he was engaged in carrying out unknown either to Lee or appellant, which would naturally fix the exact facts firmly in his memory. Lee then told appellant that he had some money with Driscoll & Co. General Williams ascertained the amount and afterwards, in absence of appellant, took the check of Driscoll & Co. therefor.

Any person, it would seem, would have been perfectly justified in considering a thing, done under the circum-

Marye v. Martin.

stances of the interview as to its subject matter with Gen-
eral Williams, as done with appellant, without entering into
any nice distinctions as to the special capacity in which the
former was acting.   Of course, as attorney, pure and simple,
he would have had no authority to compromise his client's
rights, nor would the client be bound thereby, except on
previous instruction or subsequent ratification; but this
does not seem to have been the limit of his position as
regarded by appellant.   He was to him more than agent or ·
attorney; he was mentor, guide, philosopher and friend, and
more.   There seems to have been a merger of identity, and
for the nonce Williams was Marye, while he was suspended
as actor.

Appellant calls General Williams to assist in ascertain-
ing, for one thing, the whereabouts of the money received on
sale of the converted stock; then, with complete self abne-
gation, leaves his own room at General Williams' request, so
soon as that information has been obtained, that General
Williams may have a private transaction with Lee about that
very money.   He is in the bank and sees General Williams
make a special deposit of money, which he "suspected" had
been obtained from Lee and says nothing; though, as one of
the objects of the interview was to obtain knowledge as to
that money, he would naturally have evinced some interest
at such a peculiar deposit, had not he looked upon General
Williams as his very self.   He afterwards sees Williams,
who tells him that he had gotten from Lee the certificate of
deposit and the money due from Driscoll & Co. and had
deposited the same in his own name at the bank, saying at
the same time, "This is my own transaction; you have noth-
ing to do with it; and I intend to hold the money for the
benefit of the party who loses by this affair; whoever loses I
will pay it to."   Still he said nothing, out of his implicit
trust; and possibly for the reason that he hoped that such a
transaction could be carried out, (although a moment's

thought would have told him the contrary,) that he might preserve his remedy against respondent, whom he had already warned of liability and intention to hold; and, if unsuccessful, then that he might fall back upon the money thus held for the benefit of the loser.

The law allows no such double stringing of bows. The moment appellant was told that part of the proceeds of the sale of the stock and other moneys, property of Lee, had been obtained from him by General Williams as the result of the interview before spoken of and did not repudiate the transaction so far as he was concerned, he, as to Lee, induced the belief that his tort was waived and that he stood a simple debtor of appellant. Any other view would tend to work a great wrong upon Lee. Remember always, that he not only disgorged the remaining proceeds of that tort, but also gave up his own money. What for? Undoubtedly for protection; he was thereby to escape legal consequences, other than mere repayment. His position, if appellant's theory of the result of the interview be correct, is idiotic—deprived of his money and unbenefited by its surrender. His testimony as to his understanding of the effect of the payment is consonant with reason and should be received; he supposed he was making a settlement; and from the facts, on which alone he could base his reason, the law will so hold.

If Lee so believed, as he swore, and if he might rightfully and lawfully so believe, then such was the fact, notwithstanding any contrary intention of appellant and General Williams or either of them. If such was the fact, then there was no cause of action against respondent. So the preponderance of the evidence, wherefore the motion for a new trial was properly denied. The findings, that appellant had the knowledge recited above and that Lee paid the money to General Williams for appellant's benefit, sustain the judgment.

It is affirmed.